## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | |
|---|---|
| **CLARK EDWARD HELTON,**  )  <br> Plaintiff                         )    Civil Action No. 2:21cv00015 <br>                                    ) <br> v.                                 )    **REPORT AND** <br>                                    )    **RECOMMENDATION** <br> **KILOLO KIJAKAZI,**¹              ) <br> **Acting Commissioner of Social**  )    By:  PAMELA MEADE SARGENT <br> **Security,**                       )         United States Magistrate Judge <br> Defendant                          ) | |

*I. Background and Standard of Review*

Plaintiff, Clark Edward Helton, ("Helton"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Helton filed his application for DIB on February 21, 2019, alleging disability as of May 2, 2018, based on type II diabetes; high cholesterol; blood pressure problems; vertigo; arthritis; shoulder, right knee and right elbow problems; sleep apnea; and breathing problems.[2] (Record, ("R."), at 14, 177-78, 222.) The claim was denied initially and upon reconsideration. (R. at 113-22, 124-26.) Helton then requested a hearing before an administrative law judge, ("ALJ"). (R. at 127-28.) The ALJ held a hearing on August 18, 2020, at which Helton was represented by counsel. (R. at 30-60.)

By decision dated August 25, 2020, the ALJ denied Helton's claim. (R. at 14-25.) The ALJ found Helton met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2019. (R. at 16.) The ALJ found Helton had not engaged in substantial gainful activity from May 2, 2018, the alleged onset date, through December 31, 2019, the date last insured.[3] (R. at 16.) The ALJ determined Helton had severe impairments, namely, obesity and arthritis, but he found Helton did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

---

[2] Helton protectively filed a prior DIB application on October 2, 2015, alleging disability as of June 17, 2015, which was denied initially and on reconsideration. (R. at 64.) By decision dated May 1, 2018, the ALJ denied this claim. (R. at 64-73.) Thereafter, the Appeals Council denied review. (R. at 219.)

[3] Therefore, Helton must show he was disabled between May 2, 2018, the alleged onset date, and December 31, 2019, the date last insured, to be eligible for benefits.

2

Appendix 1. (R. at 16-19.) The ALJ found Helton had the residual functional capacity to perform light work,[4] except he could lift and carry 20 pounds occasionally and 10 pounds frequently; sit, stand and walk for six hours each in an eight-hour workday; frequently climb ramps and stairs; occasionally balance, stoop, kneel, crouch and crawl; never climb ladders, ropes or scaffolds; and occasionally work at unprotected heights and around hazardous materials. (R. at 19.) The ALJ found Helton could perform his past relevant work as a mine surveyor, as generally performed in the national economy. (R. at 24.) Thus, the ALJ concluded Helton was not under a disability as defined by the Act from May 2, 2018, through December 31, 2019, and he was not eligible for DIB benefits. (R. at 24-25.) *See* 20 C.F.R. § 404.1520(f) (2021).

After the ALJ issued his decision, Helton pursued his administrative appeals, (R. at 172-75), but the Appeals Council denied his request for review. (R. at 1-5.) Helton then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2021). This case is before this court on Helton's motion for summary judgment filed July 1, 2021, and the Commissioner's motion for summary judgment filed September 2, 2021.

## *II. Facts*

Helton was born in 1957, (R. at 177), which, at the time of his alleged onset date and date last insured, classified him as a "person of advanced age" under 20 C.F.R. § 404.1563(e) (2021). Helton has a year of college instruction and past work

---

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2021).

3

experience as a mining surveyor.[5] (R. at 40-41, 54, 223.) He testified that from 2004 until the time he quit working in 2014, his mining job required him to perform "… many jobs, but [his] main job during most of that time was being a mine surveyor, above and underground." (R. at 41.) Specifically, Helton stated he "survey[ed] the boundaries of the mine and the quality, [etc]. Basically, the most we were lifting would probably have been close to 100 pounds. …" (R. at 41.) When working underground, he testified he mostly carried transit, relay and surveying equipment that weighed about 15 pounds. (R. at 41.) Helton testified, as he got older and had vision and knee problems, he basically performed the outside surveying, which required him to carry a GPS unit, ranging from 25 to 40 pounds. (R. at 41-42.) He stated he also performed coal quality and helped mix the quality of the coal from trains coming from the mountain. (R. at 42.) Helton testified that, by the end of his work, he had to carry radiation equipment, and he worked at the coal tipple to help "do the trucks and the coal at the coal quality and purchasing agent, etcetera." (R. at 42.)

Helton testified he suffered from bilateral wrist and hand problems, as well as bilateral lower extremity issues. (R. at 43.) In particular, he stated he had broken both wrists, and he dislocated and broke his right thumb while in high school. (R. at 43.) Helton stated he had knee problems due to crawling in the mines over the years; and he had broken both legs and his right heel. (R. at 43.) He said he had tenderness in the right knee and left wrist, and he had decreased range of motion in the right wrist. (R. at 43.) Helton testified he had right thumb pain, and it would "go in and out of place," and he said his right hand, from the little finger down to his wrist, was "always swollen with arthritis and stuff." (R. at 45.) He stated he could hold a pencil with his right hand, but it had affected his ability to work underground, and he started

---

[5] Helton's Disability Report indicates he completed two years of college instruction, (R. at 223), but he testified he completed only one year. (R. at 40.)

doing aboveground mine surveying, which required him to only "ride and turn little knobs and all that kind of thing with transits and push buttons and all that kind of stuff." (R. at 45-46.) However, as of the time of the hearing, Helton said he probably would have difficulty performing aboveground surveying in terms of being able to hold the "transit, work equipment." (R. at 46.) Helton testified he took over-the-counter pain relievers, a gel prescribed by his physician, and he sometimes used a knee brace and a heating pad. (R. at 46-47.) He said the knee brace helped with swelling. (R. at 46.) Helton also testified he had continued problems with vertigo at least once weekly, which would occur more if bending over, and he could not look at anything that "swirl[ed] or move[d]." (R. at 47.) He stated he would move and shake his head a certain way and take "airsickness pills" to alleviate the vertigo. (R. at 47.) He stated if he had a vertigo episode while standing, he had to sit, and if he was driving, he had to park and let it pass. (R. at 48.) Helton explained there were not many recent treatment records related to his vertigo because he did not go to the emergency department, as he knew there was nothing that could be done. (R. at 48-49.) Helton testified he had difficulty being on his feet due to his knee problems. (R. at 49-50.) He noted that, at the end of his time working, he was not surveying at all because he could not physically get up and down the mountain like he did when he was younger. (R. at 50.) He testified that, as of May 2018, he could not be on his feet for six hours out of an eight-hour workday, and, despite Dr. Baker's finding that he could stand and walk for an hour and a half at a time, he could not do this daily in a job setting. (R. at 50.)

Helton testified he began having depression in April 2019, and even the mention of that time made him shake and cry.[6] (R. at 50-51.) He stated he continued

---

[6] The record reveals that Helton lost his daughter and twin grandchildren in a house fire in April 2019. (R. at 91.)

5

to cry once or twice weekly, and during these days, he usually did nothing except "pray a lot." (R. at 51-52.) Helton testified he missed his family. (R. at 51.) He stated his depression would prevent him from performing the mine surveying job, which required him to be alert and confident of his surroundings, because he would be preoccupied with thoughts of his family. (R. at 52.)

Mark Hileman, a vocational expert, also was present and testified at Helton's hearing.[7] (R. at 54-59.) He classified Helton's past work as a mine surveyor as skilled and light, as generally performed, but heavy[8] as described by Helton. (R. at 54.) When Hileman was asked to consider a hypothetical individual of Helton's age, education and past work, who could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; sit, stand and walk six hours each in an eight-hour day; frequently climb ramps and stairs, but never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch and crawl; and occasionally work around unprotected heights and hazardous machinery, he testified such an individual could perform the mine surveyor job, as generally performed, but not as Helton performed it. (R. at 55.) Hileman also testified such an individual would have transferrable skills to a land surveyor job, a job very similar to the mining survey job, but not in the mining industry, and which existed in significant numbers in the national economy. (R. at 55-56, 58.) Hileman also was asked to consider the same hypothetical individual, but who could occasionally operate hand controls, bilaterally; occasionally handle with the left hand; and occasionally climb ramps and stairs. (R. at 57.) He testified such an individual could not perform Helton's past work and would have no transferrable skills to other work. (R. at 57.) Hileman

---

[7] Hileman also was the vocational expert who testified at Helton's prior hearing. (R. at 64.)

[8] Heavy work involves lifting items weighing up to 100 pounds at a time and frequently lifting and carrying items weighing up to 50 pounds. If someone can perform heavy work, he also can perform medium, light and sedentary work. *See* 20 C.F.R. § 404.1567(d) (2021).

testified that the first hypothetical individual, but who required a sit/stand option as frequently as hourly, could perform neither the mine surveyor nor the land surveyor job. (R. at 57-58.) Likewise, Hileman testified the first hypothetical individual, but who could perform simple and detailed, but not complex, instructions, could not perform either job. (R. at 58.)

In an undated[9] Disability Report, Helton listed his job as a "mining surveyor/engineer" in the coal mine, both underground and surface. (R. at 224.) He described this job as follows:

> I keep all maps up to date for underground and surface. I also took care of all the coal qualities for all seams both washed and raw. Took care of all truck sales and payments to the trucking companies for coal that they hauled. (Invoices). Worked at plant and [did] all ordering for parts for equipment and plant.

(R. at 224.) He reported the following amounts of time each day for each activity: walk for three hours; sit for two hours; climb for one hour; stoop for one hour; no kneeling; and stand, crouch, crawl, handle large objects, write, type, handle small objects and reach for half an hour, each. (R. at 224.) Helton stated he lifted and carried transit equipment or GPS equipment daily, but the distances varied for different jobs. (R. at 224.) He reported he frequently lifted 10 pounds, and the heaviest weight lifted was 100 pounds or more. (R. at 224.) Helton stated he supervised others half of the time. (R. at 224.) In a Work History Report, dated March 29, 2019, Helton listed his past work as "surveyor" in the coal mining industry, both underground and surface. (R. at 232.) He described this job as follows: "survey underground and surface for mines. Also [did] all office work and maps." (R. at 233.) He stated he walked six to eight hours daily; stood six to eight hours daily; sat one to two hours daily; climbed two to three hours daily; stooped two to

---

[9] Although his Report is undated, based on information contained therein, it is apparent it was completed at some time after August 29, 2018, but before May 29, 2019. (R. at 226.)

7

three hours daily; knelt two to three hours daily; crouched two to three hours daily; crawled one to two hours daily; reached eight to 10 hours daily; handled, grabbed or grasped big objects six to eight hours daily; and wrote, typed or handled small objects eight to 10 hours daily. (R. at 233.) Helton reported he carried transit and surveyor equipment from 1000 feet to two miles or further, every day. (R. at 233.) He stated he frequently lifted 25 pounds, while the heaviest weight lifted was 100 pounds or more. (R. at 233.) Helton reported he supervised one to four people for eight to 10 hours daily. (R. at 233.) In a Work Background form, Helton listed his job as a "surveyor, mine foreman." (R. at 279.) During a consultative examination with Dr. Baker, on July 7, 2019, Helton stated his past work was as a surveyor. (R. at 557.)

In rendering his decision, the ALJ reviewed records from Wellmont Lonesome Pine Hospital, ("Lonesome Pine"); Wellmont Medical Associates of Big Stone Gap; Dr. Robert McGuffin, M.D., a state agency physician; Dr. Gene Godwin, M.D., a state agency physician; Lonesome Pine Orthopaedics; Wellmont Health System; Holston Valley Hospital, ("Holston Valley"); Dr. Brent Baker, M.D.; BHMA Family Medicine; and Dr. Robert A. Botts, O.D., an optometrist.

Helton does not challenge the ALJ's evaluation of the medical opinion evidence or his ultimate residual functional capacity finding. Instead, he challenges only the ALJ's evaluation of his past relevant work and his continued ability to perform it. Therefore, this court will provide only the following cursory recitation of the treatment notes for clarity of the record.

During the relevant time, Helton received regular, routine treatment from his primary care provider, Dr. Christopher M. Basham, M.D., for shoulder pain, right knee pain, arthropathy, diabetes mellitus, hypercholesterolemia and hypertension. In

February 2018, Helton reported his pain was improving with nonsteroidal anti-inflammatory medications, and he had a normal range of motion and sensation at that time. (R. at 434-35.) Helton had a body mass index, ("BMI"), of 31. (R. at 432.) Dr. Basham recommended adding joint injections for pain, if needed. (R. at 436.) By August 2018, Dr. Basham indicated Helton had improved glucose control, as well as controlled lipids and blood pressure. (R. at 431.) He exhibited right knee crepitus with decreased range of motion, but his physical examination was, otherwise, normal. (R. at 568.) A June 2019 right knee x-ray revealed no acute findings or significant degenerative changes. (R. at 553.) In November 2019, Helton had a normal range of motion of the knees and neck, and his diabetes mellitus, blood pressure and blood sugar levels were stable. (R. at 600, 602.) In May 2020, Helton reported spending time in Florida and increasing his activity. (R. at 585.) He complained of some depression, but his physical examination remained normal, including normal mood, affect and behavior. (R. at 585-86.)

In July 2019, Helton saw Dr. Brent Baker, M.D., for a consultative examination, during which he reported diabetes mellitus, high cholesterol, blood pressure issues, vertigo, bilateral shoulder problems and right knee problems. (R. at 556.) He denied a history of hospitalizations, surgery and physical therapy. (R. at 556.) A physical examination showed a steady gait, normal hand-eye coordination, normal muscle strength, bulk and tone and no palpable muscle spasms. (R. at 558-59.) Helton exhibited no joint swelling, erythema, effusion or deformity but had tenderness to palpation of the right knee, heel and left wrist, but he was able to button and unbutton a shirt, pick up a coin, grasp a pen, write a sentence and lift, carry and handle light objects. (R. at 559.) He also could walk on his heels and toes with only mild difficulty, and he could tandem walk and stand on one foot, but not hop. (R. at 559.) Dr. Baker diagnosed Helton with diabetes mellitus and arthritis. (R. at 560-61.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2021). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2021).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider

whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Helton argues the ALJ erred by failing to properly evaluate his past relevant work. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-9.) Specifically, he argues the ALJ erred by failing to find his past relevant work was a "composite job,"[10] and, as such, the ALJ must evaluate only his ability to return to this work as it was actually performed, not as generally performed. (Plaintiff's Brief at 5-6.) He contends that, based on the ALJ's findings, a return to this job as it was actually performed would be precluded. (Plaintiff's Brief at 6.) For the reasons that follow, I find that the ALJ did not err by failing to find Helton's past relevant work was a composite job.

At step four of the Social Security evaluation procedure, the ALJ considers whether a claimant can perform past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv) (2021); *see also Thompson v. Astrue*, 442 F. App'x 804, 806 (4th Cir. 2011). "[A] claimant will be found 'not disabled' if he is capable of performing past relevant work either as he performed it in the past *or* as it is generally required by employers in the national economy." *Pass v. Chater*, 65 F.3d 1200, 1207 (4th Cir. 1995) (emphasis in original) (citing Social Security Ruling, ("S.S.R."), 82-61, 1982 WL 31387 (Jan. 1, 1982)); *see also Getch v. Astrue*, 539 F.3d 473, 482 (7th Cir. 2008) ("[T]he ALJ need not conclude that the claimant is capable of returning to the precise job he used to have; it is enough that the claimant can perform jobs substantially like that one."); *Tovar v. Astrue*, 2009 WL 4067387, at *9 (E.D. Va. Nov. 23, 2009) (the

---

[10] Helton argues his past relevant work as a mining surveyor was comprised of the jobs of: (1) a mining surveyor; and (2) a mining engineer. (Plaintiff's Brief at 7.)

11

tests for past relevant work are disjunctive, and a claimant is determined not to be disabled under either measure.).

However, when a claimant's past relevant work is a "composite job," he will be found not disabled only where he is able to perform all parts of the composite job. *See Delgado v. Berryhill*, 2018 WL 1316198, at *17 (D. Conn. Mar. 14, 2018) (citing Programs Operating Manual System, ("POMS"), DI 25005.20); *see also Jones v. Colvin*, 2016 WL 786626, at *3 (E.D. Va. Feb. 4, 2016), *adopted by* 2016 WL 816792 (E.D. Va. Feb. 26, 2016). Social Security Ruling 82-61 defines a composite job as one that has "significant elements of two or more occupations and, as such [has] no counterpart in the DOT." S.S.R. 82-61, 1982 WL 31387, at *2. Because a composite job does not have a DOT counterpart, the ALJ's evaluation of a claimant's ability to perform his past work should not focus on a particular job as generally performed. Instead, the ALJ should consult a vocational expert to assess the overlapping functions of the multiple jobs. *See* S.S.R. 82-61, 1982 WL 31387, at *2; *see also Jones*, 2016 WL 786626, at *3 (citing POMS DI 25005.020B).

It is well-settled that claimants in social security cases are entitled to a full and fair hearing of their claims. *See Lewis v. Astrue*, 2008 WL 4889126, at *5 (E.D. Va. Nov. 12, 2008) (citing *Sims v. Harris*, 631 F.2d 26, 27 (4th Cir. 1981)). Remand is necessary "[w]here the ALJ fails in his duty to fully inquire into the issues necessary for adequate development of the record, and such failure is prejudicial to the claimant." *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980). Prejudice may be established by showing the ALJ's decision "might reasonably have been different had [that] evidence been before [him] when [his] decision was rendered." *Sims*, 631 F.2d at 28 (quoting *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)). However, while the ALJ has a duty to fully and fairly develop the record, this does not mean the ALJ is required to act as substitute counsel for a claimant. *See Herrien v. Astrue*,

12

2013 WL 1121361, at *10 (E.D. Va. Feb. 21, 2013) (citing *Loving v. Astrue*, 2012 WL 4329283, at *5 (E.D. Va. Sept. 20, 2012)). Moreover, where, as here, the claimant is represented by counsel, "the ALJ is entitled to assume that a claimant … is making his strongest case for benefits." *Stuckey v. Colvin*, 2016 WL 403651, at *11 (E.D. Va. Jan. 11, 2016) (quoting *Nicholson v. Astrue*, 341 F. App'x 248, 253 (7th Cir. 2009)); *see also Aytch v. Astrue*, 686 F. Supp. 2d 590, 599 (E.D. N.C. 2010). The ALJ is not required to "exhaust every possible line of inquiry in an attempt to pursue every potential line of questioning. The standard is one of reasonably good judgment." *Hawkins v. Chater*, 113 F.3d 1162, 1168 (10th Cir. 1997) (internal quotations omitted). Moreover, the ALJ generally is entitled to "rely on the claimant's counsel to structure and present the claimant's case in a way that the claimant's claims are adequately explored." *Branum v. Barnhart*, 385 F.3d 1268, 1271 (10th Cir. 2014).

To determine "whether an ALJ has fully and fairly developed the record, the proper inquiry is whether the record contains sufficient evidence" to make a disability determination. *Stuckey*, 2016 WL 403651, at *11 (quoting *Loving*, 2012 WL 4329283, at *5). Stated differently, the regulations require only that the "evidence be 'complete' enough to make a determination regarding the nature and severity of the claimed disability, [its] duration …, and the claimant's [RFC]." *Tina R. v. Saul*, 2020 WL 3118414, at *5 (W.D. Va. Feb. 10, 2020) (quoting *Kersey v. Astrue*, 614 F. Supp. 2d 679, 693-94 (W.D. Va. 2009)).

For the following reasons, I find that the ALJ fully and fairly developed the record in this case, and he did not err by failing to evaluate Helton's past relevant work as a composite job. First, as the Commissioner correctly states in her brief, Helton was represented by the same counsel in both his prior and current claims. Moreover, in the prior decision, the ALJ found, similarly to the current decision, that

Helton's past work was as a "mining surveyor." Counsel did not assert that Helton's past work was a composite job at any time during the resolution of the prior claim. Likewise, counsel did not raise this issue in the current claim until he appealed it to this court, despite having ample opportunity to do so. For instance, at the August 2020 hearing, counsel opted to make an opening statement, during which he acknowledged the classification of Helton's past relevant work in the prior decision as a mining surveyor. In particular, counsel specified his argument was that Helton was unable to perform his past relevant work as a mining surveyor, as previously found by the same ALJ, due to both new and worsening conditions since that time. (R. at 38-39.) He made no argument regarding the classification of Helton's past relevant work, including that it was a composite job. At a later point in the hearing, during questioning regarding Helton's depression, counsel, himself, classified Helton's past relevant work as a "mine surveyor." (R. at 52.) Additionally, although Helton requested review from the Appeals Council, there is no brief setting forth his arguments contained in the record. Instead, the form requesting such review states only the reason for review as, "I am disabled." (R. at 173, 175.) Moreover, at the August 2020 hearing, Helton, himself, testified his "main job" for most of the time from 2004 to 2014 was "being a mine surveyor, above and underground." (R. at 40-41.) He also testified that, "toward the end" of his time working, he performed outside surveying, which required him to carry more weight than the underground surveying, and he did "coal quality and help[ed] mix the quality of the coal from trains when they came from the mountain." (R. at 41-42.) Helton testified, that "at the very end … [he used] radiation equipment and some other stuff," despite other employees having been laid off, as he was certified to use this equipment; and he "worked at the tipple … to help do the trucks and the coal at the coal quality and purchasing agent, et cetera." (R. at 42.) Although there are references in the record to Helton classifying his past relevant work as a "mining surveyor/engineer," a "surveyor" and a "surveyor/mine foreman," as well as Helton's various descriptions

of his job duties, I cannot find that the ALJ did not fulfill his duty to develop the record in this regard.

First, contrary to Helton's argument that the state agency medical sources classified his past work as a "mining surveyor/engineer," (R. at 85, 101), the Commissioner is correct that these sources simply lifted this label from Helton's Disability Report. (R. at 224.) In other words, this is merely Helton's classification of his work, not a finding made by the state agency medical sources. Next, because this Disability Report was completed at some time between August 29, 2018, and May 29, 2019, Helton's classification of his past relevant work likely included the duties he was performing "near the end" or "at the very end" of his work, thereby not accurately reflecting the nature of the job for the vast majority of the time he performed it. In the Disability Report, he listed activities like keeping maps up to date, taking care of coal qualities for all seams, handling invoices, working at the plant and ordering parts. (R. at 224.) Likewise, the Work History Report, in which Helton reported his job was as a "surveyor" in the coal mining industry, both underground and surface, but which included "all office work and maps" in addition to surveying, was completed March 29, 2019. (R. at 232.) Thus, it also likely included the duties Helton was performing at the end of his work. On an undated Work Background form, he listed his job as a "surveyor, mine foreman," but he did not specify what his job duties were. (R. at 279.) Lastly, on July 7, 2019, Helton advised Dr. Baker that his past work was as a "surveyor." (R. at 557.)

Also, in this case, the ALJ did not have a heightened duty to develop the record, as Helton was represented by counsel. In fact, as stated above, he was represented by the same counsel who represented him during his prior claim and who should have been very familiar with Helton's claims and the relevant issues that should have been advanced in order to present the strongest possible case. Moreover,

15

the hearing transcript further supports a finding that the ALJ adequately developed the record. At the hearing, after Helton described his past relevant work, the ALJ specifically asked Hileman, the vocational expert, if he needed additional information. (R. at 42.) Hileman stated he did not, and he classified Helton's past work as "one occupation" – that of a mine surveyor, found at DOT 018.161.010. (R. at 54.) Hileman further testified this job is classified as light in the DOT, but it was heavy as performed by Helton. (R. at 54.) Hileman concluded that an individual with the residual functional capacity as ultimately found by the ALJ, could perform Helton's work as generally performed in the national economy. (R. at 24.) After the vocational expert testified, when the ALJ explicitly asked if he had "anything else," he responded he did not. (R. at 58.) Thereafter, the ALJ asked Hileman if his testimony was consistent with the DOT, to which he responded it was, "in general," noting that the DOT did not "split [limitations] between unilateral and bilateral activities" and that the DOT does not address a sit/stand option, which may conflict with the DOT. (R. at 59.) However, Hileman stated his testimony regarding these things was based upon his more than 30 years of experience. (R. at 59.) In his decision, the ALJ stated he accepted Hileman's testimony because it did not conflict with or contradict the DOT. (R. at 24.) The ALJ further noted that Helton and his counsel presented no cogent evidence to refute Hileman's testimony. (R. at 24.)

For all these reasons, I find that there was sufficient evidence for the ALJ to render his disability determination. *See Stuckey*, 2016 WL 403651, at *11. Moreover, I find that, even if the court were to find the ALJ failed to fully inquire into the issues necessary for adequate development of the record, such a failure was not prejudicial to Helton. In particular, the evidence shows that Helton's past work was not a composite job. Therefore, even if the ALJ had evaluated this issue, it would not reasonably have changed his decision. *See Sims*, 631 F.2d at 28. As stated herein, Helton argues his past work was comprised of a mining surveyor and a mining

16

engineer. However, a review of these DOT job listings shows that Helton's past work did not include significant elements of the mining engineer job.

The DOT listing for "SURVEYOR, MINE" is found at 018.161-010 and describes this job as follows:

> Conducts surveys at surface and subsurface mine sites to obtain data used in planning mining operations: Takes instrument readings of sun or stars and calculates longitude and latitude to determine mine location. Directs survey technicians and helpers … in use of electronic surveying equipment, light emitting systems, or other instruments to transfer surface survey positions and directions to underground areas and survey assigned sections. Compiles data necessary for driving and connecting underground passages to control direction and extent of mining operation. Compiles volume of coal or ore in portions of mine, using survey data. Surveys and calculates volume of material deposits, spoil piles, or veins, and amount of overburden to be removed. Drafts or directs others to draft maps of survey data. May assist MINE SUPERINTENDENT (mine & quarry) 181.117-014 and MINING ENGINEER (mine & quarry) 010.061-014 in planning mining operations. May conduct surveys of tunnels, subway sites, and underground storage facilities.

Dictionary of Occupational Titles, ("DOT"), 018.161-010, 1991 WL 646424 (Jan. 1, 2016). The DOT listing for "MINING ENGINEER" is found at 010.061-014 and describes this job as follows:

> Conducts research to determine location and methods of extracting minerals …: Conducts or collaborates in geological exploration, and reviews maps and drilling logs to determine location, size, accessibility, and estimated value of mineral deposit. Determines methods to extract minerals. … Plans, recommends, and coordinates mining process, type and capacity of haulage equipment … and labor utilization. Lays out and directs mine construction operations. … May devise methods and locations to store and replace excavated soil to reclaim mine sites. May analyze labor requirements, equipment needs, and operational costs to compute and prepare annual budget reports. May apply knowledge of mining engineering to solve problems concerned with environment.

DOT 010.061-014, 1991 WL 646304 (Jan. 1, 2016). Helton does not allege he conducted any research or geological exploration; determined methods for mineral extraction; planned, recommended or coordinated mining process type and capacity of haulage equipment or labor utilization; laid out or directed mine construction operations; devised methods and locations for storing/replacing excavated soil; performed analysis for preparation of budget reports; or dealt with any environmental issues. The only job duty in this DOT listing that even arguably might overlap with Helton's mining surveyor job is that related to maps. As stated above, in a Disability Report, Helton stated his job duties included keeping maps up to date, and in a Work History Report, he stated he did all office work and maps. (R. at 224, 232.) Nothing about these statements indicates he reviewed maps to make various determinations regarding mineral deposits, however. And, even if Helton did do this, I cannot find it was a significant element of his past work. He testified under oath regarding his job duties, but mentioned nothing related to maps. Further, the court notes that the listing for "SURVEYOR, MINE" in the DOT also includes drafting maps for survey data as a duty of that job.

For all the reasons stated herein, I find that the ALJ did not err by failing to adequately develop the record and evaluate Helton's past work as a composite job. That being the case, and because Helton does not argue the ALJ erred in his residual functional capacity finding, I further find that substantial evidence supports the ALJ's finding that Helton was not disabled and was not entitled to DIB benefits.

Based on the above, I find substantial evidence exists to support the ALJ's classification of Helton's past relevant work and his ultimate disability finding.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's classification of Helton's past relevant work; and

2. Substantial evidence exists in the record to support the Commissioner's finding that Helton was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Helton's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:   August 1, 2022.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE